UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ORIGEN.AI, INC., | |
| Plaintiff, | |
| v. | Case No. 2:26-cv-01558 |
| DANIEL BADAWI, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

John J. Powell  (*pro hac vice* forthcoming)
Edward J. Heffernan  (*pro hac vice* forthcoming)
Anna Volkov  (Bar ID #547712025)
MONTGOMERY McCRACKEN
    WALKER & RHOADS LLP
1735 Market Street
Philadelphia, Pennsylvania 19103
(215) 772-7298
jpowell@mmwr.com
eheffernan@mmwr.com
avolkov@mmwr.com

*Counsel for Plaintiff OriGen.AI, Inc.*

# TABLE OF CONTENTS

Preliminary Statement..................................................................................................... 1

Factual Background ......................................................................................................... 3

    A.    OriGen's Proprietary Technology and Trade Secrets................................ 3

    B.    Badawi's Employment and Contractual Obligations................................ 3

    C.    Badawi's Resignation Ultimatum and Simultaneous Data Exfiltration ................ 5

    D.    Badawi's Deception Regarding UniversalAGI and His Departure ...................... 6

    E.    OriGen Discovers UniversalAGI's Competing Business and Badawi's Data Theft ............................................................................................. 7

    F.    Badawi's False Statements and the False Termination Certification ................... 7

    G.    Exhaustion of Out-of-Court Resolutions and the Current Impasse ...................... 8

Controlling Legal Standards ........................................................................................... 9

Argument ....................................................................................................................... 10

I.    THE COURT SHOULD GRANT THE ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS. .................................................................... 10

    A.    OriGen is Likely to Prevail on the Merits............................................... 10

    B.    OriGen Will Suffer Irreparable Harm Absent Relief............................. 15

    C.    The Balance of Equities Weighs Heavily in Favor of Injunctive Relief. ............ 16

    D.    Granting the TRO is In the Public Interest. ............................................ 17

    E.    The Requested TRO is Narrowly Tailored. ............................................ 17

II.    THE COURT SHOULD PERMIT LIMITED EXPEDITED DISCOVERY. .................. 18

    A.    Expedited Discovery Is Necessary to Prevent Further Irreparable Harm to OriGen.............................................................................................. 18

    B.    Additional Factors Favor Expedited Discovery Here........................... 18

Conclusion .................................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Acierno v. New Castle Cnty.*,
  40 F.3d 645 (3d Cir. 1994)................................................................................. 10

*BDO Seidman v. Hirshberg*,
  93 N.Y.2d 382 (1999) .........................................................................................11

*Complete Logistical Servs., LLC v. Rulh*,
  350 F. Supp. 3d 512 (E.D. La. 2018).................................................................. 13

*Corp. Synergies Grp., LLC v. Andrews*,
  2019 WL 3780098 (D.N.J. Aug. 12, 2019) ......................................................... 14

*Estee Lauder Cos. v. Batra*,
  430 F. Supp. 2d 158 (S.D.N.Y. 2006)................................................................. 12

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
  730 F.2d 61 (2d Cir. 1984)................................................................................. 15

*Ingersoll-Rand Co. v. Ciavatta*,
  542 A.2d 879 (N.J. 1988)................................................................................... 17

*Int'l Bus. Machs. Corp. v. Papermaster*,
  2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) ...................................................... 16

*Juul Labs, Inc. v. 4X PODS*,
  439 F. Supp. 3d 341 (D.N.J. 2020) .................................................................. 9, 15

*Kos Pharms., Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004)............................................................................... 10

*Mallet & Co. v. Lacayo*,
  16 F.4th 364 (3d Cir. 2021) ............................................................................... 13

*Mirashi v. Doe*,
  2025 U.S. Dist. LEXIS 54141 (D.N.J. Mar. 21, 2025)................................... 15, 18

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*,
  392 F.3d 520 (2d Cir. 2004)................................................................................11

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
  290 F.3d 578 (3d Cir. 2002)............................................................................... 16

*Oakwood Labs LLC v. Thanoo*,
  999 F.3d 892 (3d Cir. 2021)............................................................................... 13

*Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    48 N.Y.2d 84, 89 (1979) ........................................................................... 12

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017) ..................................................................... 10

*SK & F. Co. Premo Pharm. Labs., Inc.*,
    625 F.2d 1055 (3d Cir. 1980) ................................................................... 10

*Strike 3 Holdings, LLC v. Doe*,
    2020 U.S. Dist. LEXIS 114598 (D.N.J. June 30, 2020) ........................ 18

*Ticor Title Ins. Co. v. Cohen*,
    173 F.3d 63 (2d Cir. 1999) .............................................................. 12, 15

**Statutes**

18 U.S.C. § 1836(b)(1) ............................................................................... 13

18 U.S.C. § 1836, *et seq.* ............................................................................ 10

18 U.S.C. § 1839(3) .................................................................................... 13

18 U.S.C. § 1839(5)(A) .............................................................................. 14

18 U.S.C. § 1839(6)(A) .............................................................................. 14

Plaintiff OriGen.AI, Inc. ("OriGen" or "Plaintiff") submits this memorandum of law in support of its motion for a temporary restraining order and preliminary injunction against its former employee Defendant Daniel Badawi, Ph.D.

## PRELIMINARY STATEMENT

One of OriGen's engineers, Defendant Daniel Badawi, recently resigned his employment to join a direct competitor of the Company, UniversalAGI, Inc. ("UniversalAGI"). Dr. Badawi is bound by a Confidential Information and Invention Assignment Agreement (the "CIIAA") that sets forth reasonable non-competition and confidentiality covenants. Moreover, based on his role as a Physics Informed Neural Networks Engineer, Dr. Badawi is in possession of highly confidential information—including the complete proprietary computer source code for OriGen's market-leading artificial intelligence platform—whose dissemination to or use by a competitor such as UniversalAGI would inflict upon OriGen irreparable harm.

The threat to OriGen is not merely theoretical. Forensic evidence confirms that in the days immediately preceding his resignation, Dr. Badawi surreptitiously exfiltrated massive quantities of OriGen's most sensitive trade secrets. He did so by connecting an unauthorized USB mass storage device to his Company-issued laptop, and by configuring a folder on his work computer—deceptively titled "Daniel – Personal"—to automatically synchronize with a personal cloud storage account. Rather than personal files, this synced folder contained a trove of OriGen's proprietary data, including the latest versions of its source code, unpublished AI algorithms, highly sensitive reservoir modeling data, and the encryption keys required to access the Company's development virtual machines.

Dr. Badawi then engaged in a pattern of deception to conceal his conduct. To evade his non-competition obligations, he falsely assured OriGen in writing that UniversalAGI operated in

a "different market" and did not compete with the Company.  Days later, OriGen discovered that UniversalAGI was actively recruiting engineers to build the exact same PINN-driven reservoir simulation technology that Dr. Badawi had been developing at OriGen.  When confronted by OriGen's counsel with the forensic evidence of his data exfiltration, Dr. Badawi misrepresented the date he connected the USB device and feigned ignorance of the cloud synchronization.  He compounded this deception by executing a materially false Termination Certification under penalty of perjury, certifying that he possessed no OriGen data just hours after admitting in writing to OriGen's counsel that he still retained access to the exfiltrated files.

In a good-faith effort to secure its property and resolve this matter without judicial intervention, OriGen shared conclusive forensic evidence of the data theft with Dr. Badawi's counsel and entered into a brief standstill agreement through Monday, February 16, 2026.  Those efforts have reached a definitive impasse.  Dr. Badawi now admits through counsel that OriGen's proprietary files reside in his personal cloud account, but offers the implausible *post hoc* rationalization that this massive exfiltration was merely an "inadvertent" automatic sync triggered by logging into Microsoft Office. He offers no innocent explanation for the multiple unauthorized USB connections made that same evening.

Most critically, Dr. Badawi categorically refuses to honor his one-year non-competition covenant and has made clear his intention to commence employment with UniversalAGI. He has likewise refused OriGen's demands to review his communications with his prospective employer to verify that no trade secrets have already been transmitted.

Faced with a former employee who admits to retaining access to the Company's core trade secrets, yet adamantly refuses to refrain from joining a direct competitor, OriGen has no choice but to seek the Court's intervention to enforce the CIIAA and the Defend Trade Secrets

Act. OriGen respectfully requests a temporary restraining order compelling Dr. Badawi to honor his contractual obligations, enjoining his use or disclosure of OriGen's trade secrets, enjoining his employment with UniversalAGI during the restricted period, freezing his electronic devices and cloud accounts, and permitting expedited forensic discovery to secure OriGen's property.

## FACTUAL BACKGROUND

### A.     OriGen's Proprietary Technology and Trade Secrets

OriGen is a pioneer in the use of artificial intelligence for the energy sector.  Following years of research and millions of dollars of investment, OriGen developed its flagship platform, Proteus, which uses Physics-Informed Neural Networks ("PINNs") to simulate reservoir behavior in real-time.  (Declaration of Ruben Rodriguez Torrado, Ph.D. ["Torrado Decl."] ¶¶ 4-6.)  This technology simulates the flow of oil, gas, and other materials through underground and undersea reservoirs thousands of times faster than traditional methods.  (*Id.* ¶ 5).

OriGen's competitive advantage relies entirely on its proprietary technology, including the specific architecture of its neural networks, training data models, mathematical algorithms, and computer source code.  (*Id.* ¶ 6.)  OriGen protects these highly valuable trade secrets through strict security measures, including SOC II Type 2 certification, need-to-know data access policies, and comprehensive confidentiality agreements for all employees.  (*Id.* ¶ 10; Ex. B).

### B.     Badawi's Employment and Contractual Obligations

OriGen hired Defendant Daniel Badawi on January 30, 2025, as a Physics Informed Neural Networks Engineer.  (*Id.* ¶ 7.)  In this role, Badawi was granted high-level access to OriGen's crown jewel intellectual property, including the Proteus source code, data models, and proprietary algorithms.  (*Id.*).

As a condition of his employment, Badawi executed a Confidential Information and Invention Assignment Agreement (the "CIIAA"), which is governed by New York law. (Torrado Decl. Ex. A at Att. A, § 12(a).)  The CIIAA imposes several critical, post-employment obligations and stipulations:

- **Confidentiality:** Under Section 3, Badawi agreed to hold in strictest confidence, and not use or disclose, OriGen's "technical data, trade secrets... software codes and designs, algorithms... [and] research."  (*Id.* § 3.)

- **Return of Property:** Under Section 5, Badawi agreed that upon the termination of his employment, he would immediately deliver to the Company all property, including all "electronic media" and "computer programs." He also agreed to execute a Termination Certification confirming his compliance.  (*Id.* §§ 5-6.)

- **Non-Competition:** Under Section 8, Badawi agreed to a twelve-month non-competition covenant, promising not to directly or indirectly engage or participate in "any business that competes with the business of the Company" for one year following the termination of his employment.  (*Id.* § 8.)

- **Injunctive Relief and Bond:** Under Section 12(f), Badawi acknowledged that a "violation of this Agreement by me may cause the Company irreparable harm, and therefore I agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, that a $1,000 bond will be adequate) . . . ."  (*Id.* § 12(f).)

**C.    Badawi's Resignation Ultimatum and Simultaneous Data Exfiltration**

Exactly one year after he was hired, at approximately 6:15 p.m. on Friday, January 30, 2026, Badawi called OriGen Chief Operating Officer David Castiñeira to announce he had received a competing job offer.  (Declaration of David Castiñeira Areas, Ph.D. ["Castiñeira Decl."] ¶ 2.)  Badawi refused to name the prospective employer, but issued an ultimatum: unless OriGen increased his salary by $50,000 and authorized his immediate relocation to Houston, Texas, by Sunday, he would resign and accept the new position.  (*Id.*)  At 11:00 p.m. that evening, he emailed a heavily redacted copy of his new offer letter to substantiate his demand, concealing the identity of the competing firm.  (*Id.* ¶¶ 3-4, Ex. A.)

Unbeknownst to OriGen, in the hours surrounding this ultimatum, Badawi initiated a massive exfiltration of OriGen's proprietary data from his Company-issued laptop.

First, forensic analysis of the Windows system logs (setupapi.dev.log) on Badawi's laptop reveals that at 8:53 p.m. on January 30—less than three hours after demanding a raise—an unauthorized USB mass storage device identified as "General UDisk" was connected to his machine.  (Declaration of Alberto Pumar Jiménez ["Pumar Decl."] ¶¶ 22-26.)  The logs demonstrate that this same USB device was connected multiple times over the following minutes.  (*Id.* ¶ 23.)  Connecting unauthorized USB drives is strictly prohibited under OriGen's security policies.  (*Id.* ¶ 27.)

Second, forensic review revealed that Badawi configured a local folder on his work laptop to automatically synchronize with a personal Microsoft OneDrive account linked to his personal email address, danielbadawi8@gmail.com.  (*Id.* ¶¶ 11-14.)  Badawi deceptively titled this folder "Daniel – Personal."  (*Id.* ¶ 15.)  Despite its name, the folder did not contain personal files; rather, it contained a massive, highly organized repository of OriGen's most sensitive trade secrets.  (*Id.* ¶¶ 15-16.)  Forensic imaging confirms that Badawi successfully synced to his

5

personal cloud account: (1) the latest versions of OriGen's computer source code (such as the "validate_model" subfolder containing core neural network architectures); (2) novel, unpublished proprietary algorithms; (3) highly sensitive data files used for reservoir modeling; and (4) the encryption keys required to access OriGen's development virtual machines.  (*Id.* ¶¶ 16-19; Ex. A.)

### D.    Badawi's Deception Regarding UniversalAGI and His Departure

On Sunday, February 1, 2026, OriGen CEO Ruben Torrado formally invoked Section 7 of the CIIAA, requiring Badawi to identify his prospective employer to allow OriGen to assess potential conflicts of interest.  (Torrado Decl. ¶ 13; Ex. C.)  Badawi responded that evening, identifying his new employer as "UniversalAGI."  (*Id.* ¶ 14; Ex. D.)

To induce OriGen into believing his departure posed no threat and to evade his non-competition covenant, Badawi made specific, written misrepresentations regarding UniversalAGI's business.  He stated that UniversalAGI was "involved in hydrodynamics and aerodynamics (CFD)" and was "in a different market" than OriGen.  (*Id.*)  He assured the Company: "I don't think my move there would in any way violate my CIIAA agreement with OriGen."  (*Id.*)

Relying on these assurances, OriGen accepted Badawi's resignation on Monday, February 2, 2026.  (*Id.* ¶¶ 16-17.)  During an exit interview, Badawi requested permission to access his laptop one last time to delete what he claimed were personal tax and immigration files.  (Pumar Decl. ¶ 5.)  Under the supervision of his Team Lead, Alberto Pumar, Badawi deleted several files and then immediately emptied the computer's Recycle Bin before he could be stopped, permanently obscuring exactly what he had deleted locally.  (*Id.* ¶ 6.)

### E. OriGen Discovers UniversalAGI's Competing Business and Badawi's Data Theft

On Friday, February 6, 2026, Badawi's deception unraveled.  Dr. Torrado received a LinkedIn message from a candidate interviewing to fill Badawi's vacant role at OriGen, noting that the candidate was also interviewing for an "almost identical role" at UniversalAGI. (Torrado Decl. ¶ 23; Ex. E.)

Dr. Torrado at once reviewed UniversalAGI's website and discovered a new job posting for a "Founding Reservoir Engineer."  (*Id.* ¶¶ 26-27.)  The posting—which sought an engineer to "build foundation AI models" for "physics simulation" and to integrate "proxy/surrogate models" into "subsurface workflows"—proved definitively that UniversalAGI was actively recruiting engineers to build the exact technology Badawi had spent the last year developing at OriGen.  (*Id.* ¶ 27; Ex. F.)

Realizing Badawi had lied about his new employer, OriGen at once launched the internal forensic review that uncovered Badawi's unauthorized USB device connections and the "Daniel – Personal" OneDrive exfiltration.  (*Id.* ¶ 30; Pumar Decl. ¶¶ 8-27.)

### F. Badawi's False Statements and the False Termination Certification

On February 8, 2026, OriGen's counsel sent a cease-and-desist letter to Badawi outlining the forensic findings and demanding the return of the stolen data.  (Declaration of John J. Powell ["Powell Decl."] ¶ 3; Ex. A.)  Badawi responded on February 9.  While he admitted to possessing the USB drive and retaining the OneDrive account connected to his OriGen laptop, he offered explanations that are irreconcilable with the forensic evidence. He claimed he only connected the USB drive on Sunday, February 1 (system logs prove it was connected multiple times on Friday, January 30), and he feigned total ignorance of the massive cloud

synchronization, claiming it must have happened "automatically." (*Id.* ¶ 4; Ex. B; Pumar Decl. ¶ 31.)

He also lied about his execution of the Termination Certification. Following his departure on February 2, Dr. Castiñeira had sent Badawi the Certification via DocuSign. (Castiñeira Decl. ¶ 7.) On February 3, Badawi emailed Dr. Castiñeira, stating: "I have signed the document." (*Id.* ¶ 9; Ex. D.) This was a fabrication. DocuSign audit logs confirm that while Badawi viewed the document on February 3, he intentionally closed it without signing. (*Id.* ¶ 10; Ex. B.) Badawi repeated this falsehood in his February 9 email to OriGen's counsel. (Powell Decl. ¶ 4; Ex. B.)

In fact, it was not until 7:47 p.m. on February 9—hours *after* sending his email to OriGen's counsel admitting he still had access to the synced files—that Badawi finally executed the Certification under penalty of perjury, falsely certifying that he possessed no OriGen data. (Castiñeira Decl. ¶¶ 13-16; Exs. B, F.)

### G. Exhaustion of Out-of-Court Resolutions and the Current Impasse

In a good-faith effort to avoid litigation, OriGen shared the forensic evidence with UniversalAGI's counsel on an attorneys-eyes-only basis. (Powell Decl. ¶¶ 12-14.) Following this disclosure, UniversalAGI scrubbed the "Founding Reservoir Engineer" job posting from its website. (Torrado Decl. ¶ 40.)

OriGen also entered into a brief standstill agreement with Badawi's counsel to pause litigation through Monday, February 16, 2026, ensuring Badawi would not commence employment at UniversalAGI while negotiations continued. (Powell Decl. at Ex. M.) On Monday afternoon, OriGen presented a framework for resolution, requiring Badawi to honor his non-compete, submit to a neutral forensic examination, and permit a targeted review of his

communications with UniversalAGI to ensure no trade secrets had been transmitted.  (*Id.* at Ex. N.)

Those negotiations failed.  At 10:02 p.m. on Monday evening, Badawi's counsel transmitted an email categorically refusing to honor the twelve-month non-competition covenant and refusing to produce Badawi's communications with UniversalAGI.  (*Id.* at Exs. O & P.) While finally conceding that OriGen's proprietary files reside in his personal cloud account, Badawi now offers the implausible *post hoc* rationalization that this massive exfiltration was merely an "inadvertent" automatic sync triggered when he logged into a personal Microsoft Office account to use Excel and PowerPoint—an excuse that completely ignores the unauthorized USB drive connections made that very same evening.  (*Id.*)

Attempting to excuse his refusal to honor the non-compete, Badawi's counsel invoked a New York legal doctrine regarding involuntary termination, claiming Badawi was "laid off" and "terminated without cause."  (*Id.*)  This ignores the reality that Badawi issued a voluntary ultimatum on January 30—demanding a $50,000 raise and relocation, or else he would resign and accept a competing offer—which the Company simply accepted.  (Castiñeira Decl. ¶ 2; Torrado Decl. ¶¶ 16-17.)

Because Badawi admits to retaining access to the Company's core trade secrets yet adamantly refuses to refrain from commencing employment with a direct competitor, OriGen requires the Court's immediate intervention.

### CONTROLLING LEGAL STANDARDS

The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction.  *Juul Labs, Inc. v. 4X PODS*, 439 F. Supp. 3d 341, 350 (D.N.J. 2020).  The primary purpose of preliminary injunctive relief is the "maintenance of the status

quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). To obtain a temporary restraining order or preliminary injunction in the Third Circuit, the moving party must demonstrate: (1) a reasonable probability of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017); *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). To establish a likelihood of success on the merits, a plaintiff is not required to prove its case to an absolute certainty; rather, it need only establish a "reasonable probability" of success. *SK & F. Co. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1066 (3d Cir. 1980). The Third Circuit employs a "sliding scale" approach: if the moving party establishes the two "gateway factors" of a likelihood of success on the merits and irreparable harm, the court then evaluates and balances all four factors to determine, in its equitable discretion, whether the injunction should issue. *Reilly*, 858 F.3d at 179.

## ARGUMENT

### I. THE COURT SHOULD GRANT THE ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS.

#### A. OriGen is Likely to Prevail on the Merits.

OriGen is highly likely to prevail on the merits of its causes of action for breach of contract and misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*

##### 1. Breach of Contract

OriGen is likely to succeed on the merits of its breach of contract claim. Under New York law, which governs the CIIAA (Torrado Decl. Ex. A at Att. A, § 12(a)), a plaintiff establishes a likelihood of success on a breach of contract claim by demonstrating: (1) the

existence of a valid contract; (2) the plaintiff's performance; (3) the defendant's breach; and

(4) resulting damages. *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir.

2004). There is no dispute that the CIIAA is a valid, enforceable contract, and OriGen fully

performed its obligations by employing and compensating Defendant and entrusting him with

access to the Company's most valuable intellectual property.

The record demonstrates that Defendant has flagrantly breached, and continues to breach,

multiple core provisions of the CIIAA. First, Defendant breached the confidentiality and return-

of-property covenants (Sections 3 and 5) by exfiltrating OriGen's proprietary source code,

algorithms, and reservoir data to an unauthorized USB drive and a personal OneDrive account.

Rather than return the Company's property upon his departure as required, Defendant retained

this data and subsequently executed a materially false Termination Certification (Section 6)

under penalty of perjury. Defendant's recent admission through counsel that he continues to

possess OriGen's core trade secrets in a personal cloud account constitutes a clear, ongoing

breach of his contractual obligation to immediately return all Company property—regardless of

his implausible *post hoc* excuse that the massive data exfiltration was merely an "inadvertent"

sync.

Second, Defendant is in imminent breach of the twelve-month non-competition covenant

(Section 8) by accepting employment with UniversalAGI. Under New York law, restrictive

covenants are enforceable when they are reasonable in time and geographic scope, necessary to

protect an employer's legitimate interests, not harmful to the general public, and not

unreasonably burdensome to the employee. *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89

(1999).

The CIIAA's non-competition provision easily satisfies this standard.  A one-year restriction is routinely upheld as reasonable by courts applying New York law.  *See, e.g., Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 180 (S.D.N.Y. 2006).  Moreover, the protection of trade secrets is the quintessential "legitimate interest" justifying the enforcement of a non-compete.  *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70 (2d Cir. 1999).  Defendant possesses the architectural blueprint for OriGen's Proteus platform, and UniversalAGI is actively recruiting engineers to build the exact same PINN-driven reservoir simulation technology.  (Torrado Decl. ¶¶ 26–27; Ex. F.)  Defendant simply cannot perform his new role at UniversalAGI without drawing upon OriGen's confidential information.

Defendant's counsel recently asserted that the non-competition covenant is unenforceable on the theory that Defendant was "laid off" and "terminated without cause."  (Supp. Powell Decl. Ex. C.)  While New York courts may decline to enforce a non-compete where an employer terminates an employee without cause, *see Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 48 N.Y.2d 84, 89 (1979), this defense relies on a complete distortion of the factual record.  Defendant was not laid off.  To the contrary, on January 30, 2026, Defendant issued a voluntary ultimatum: either OriGen grant him an immediate $50,000 salary increase and authorize his relocation to Texas, or he would resign and accept a competing offer.  (Castiñeira Decl. ¶ 2.)  OriGen simply declined his extortionate demands and accepted his resignation.  Defendant cannot manufacture an equitable defense to a valid contract by delivering an ultimatum and then attempting to recharacterize the Company's acceptance of his departure as an involuntary termination.

Because the CIIAA is enforceable and Defendant's breaches are undeniable, OriGen has established a clear likelihood of success on the merits.

2.    Misappropriation of Trade Secrets

The DTSA provides a federal cause of action for the owner of a trade secret that is misappropriated.  18 U.S.C. § 1836(b)(1).  To establish a likelihood of success on a DTSA claim, a plaintiff must demonstrate: (1) the existence of a trade secret; (2) that the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce; and (3) the misappropriation of that trade secret.  *Oakwood Labs LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021).

There is no genuine dispute that OriGen's proprietary computer source code, novel PINN algorithms, reservoir modeling data, and virtual machine encryption keys constitute trade secrets. Under the DTSA, a trade secret exists where the owner has taken reasonable measures to keep the information secret, and the information derives independent economic value from not being generally known or readily ascertainable through proper means. 18 U.S.C. § 1839(3).  Source code and proprietary algorithms are the quintessential embodiments of protectable trade secrets. *See, e.g., Mallet & Co. v. Lacayo*, 16 F.4th 364, 386 (3d Cir. 2021).  OriGen safeguards this information through strict access controls, SOC II Type 2 certification, and comprehensive confidentiality agreements.  (Torrado Decl. ¶ 10; Ex. B.)  The information's economic value is self-evident, as it forms the architecture of OriGen's market-leading Proteus platform.  Further, the interstate commerce element is readily met, as Proteus is accessed by customers across the United States via web browsers and API.  *See Complete Logistical Servs., LLC v. Rulh*, 350 F. Supp. 3d 512, 520 (E.D. La. 2018).

OriGen has also made a compelling showing of misappropriation.  Under the DTSA, misappropriation includes the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A).  "Improper means" includes theft, misrepresentation, or a breach of a duty to maintain secrecy.  18 U.S.C. § 1839(6)(A).

The forensic record establishes that Defendant systematically acquired OriGen's most sensitive trade secrets by improper means, in direct violation of the CIIAA and Company policy. First, Defendant exfiltrated data using an unauthorized USB mass storage device mere hours after delivering his compensation ultimatum to the Company.  (Pumar Decl. ¶¶ 22-26.)  Second, Defendant admits that a massive repository of OriGen's proprietary files, including its source code, was synchronized to a personal Microsoft OneDrive account linked to his personal email address.  (Supp. Powell Decl. Ex. C).

Defendant's *post hoc* assertion that this synchronization was a mere "inadvertent" byproduct of logging into Microsoft Office to use Excel does not cure the misappropriation.  He acquired and retains possession of the Company's trade secrets in an unauthorized personal cloud environment in breach of his duty to maintain secrecy, and he failed to disclose this possession prior to his departure or even upon receipt of OriGen's cease-and-desist letter. Furthermore, his "inadvertent sync" narrative conveniently ignores his simultaneous use of the unauthorized USB drive on the very same evening.  When a departing employee transfers the employer's core source code to personal storage devices and cloud accounts on the eve of departing for a competitor, a likelihood of success on the merits is firmly established. *See Corp. Synergies Grp., LLC v. Andrews*, 2019 WL 3780098, at *6 (D.N.J. Aug. 12, 2019).

**B.      OriGen Will Suffer Irreparable Harm Absent Relief.**

Defendant's imminent breach of his non-competition covenant and his retention of OriGen's trade secrets pose a threat of irreparable harm for which there is no adequate remedy at law.

First, Defendant expressly stipulated in Section 12(f) of the CIIAA that a "violation of this Agreement by me may cause the Company irreparable harm," entitling OriGen to seek injunctive relief.  (Torrado Decl. Ex. A at Att. A, § 12(f.).)  Under New York law, which governs the CIIAA, such contractual acknowledgments are viewed as admissions of irreparable harm and are entitled to significant weight.  *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999).

Second, federal courts in this District routinely presume irreparable harm where a former employee misappropriates proprietary information and departs for a direct competitor.  *Juul Labs, Inc. v. 4X PODS*, 439 F. Supp. 3d 341, 350 (D.N.J. 2020) (finding irreparable harm where defendant absconded with proprietary data); *Mirashi v. Doe*, 2025 U.S. Dist. LEXIS 54141, at *11 (D.N.J. Mar. 21, 2025) (recognizing the immediate irreparable harm posed by the rapid, untraceable dissemination of digital assets).  Defendant possesses the blueprint for OriGen's entire business. The data Defendant misappropriated—specifically, the PINN-based algorithms and source code—is exactly what UniversalAGI is actively seeking to build.  (Torrado Decl. ¶¶ 26-27; Ex. F.)  Allowing a competitor to obtain this playbook would save UniversalAGI years of research and millions of dollars in development costs, effectively destroying OriGen's competitive advantage overnight.  This is the very definition of a harm that cannot be unwound or adequately compensated with monetary damages.  *See FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) ("[A] trade secret once lost is, of course, lost forever").

Defendant cannot rebut this harm by simply asserting, through counsel, that he has not yet transmitted the files. His word offers "cold comfort" when weighed against his established pattern of deception—including his false statements regarding UniversalAGI's business, his misrepresentations regarding the USB drive, and his execution of a materially false Termination Certification. *See Int'l Bus. Machs. Corp. v. Papermaster*, 2008 WL 4974508, at *13 (S.D.N.Y. Nov. 21, 2008).

### C.    The Balance of Equities Weighs Heavily in Favor of Injunctive Relief.

The balance of hardships tips decidedly in OriGen's favor. OriGen faces the catastrophic, irreversible loss of its core intellectual property and its competitive standing in the AI energy sector. Conversely, the requested injunction imposes no legally cognizable hardship on Defendant, as it merely requires him to abide by the contractual obligations he voluntarily assumed and for which he was generously compensated. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (injury resulting from a party's own unlawful or breaching conduct does not tip the balance of equities in its favor).

Defendant's counsel recently asserted that Badawi's non-competition covenant is void under New York law on the theory that he was "laid off" and "terminated without cause." (Supp. Powell Decl. Ex. C.) That argument fundamentally misrepresents the factual record. Badawi was not terminated; he issued a voluntary ultimatum on January 30, demanding a $50,000 raise and relocation by Sunday or he would leave for a competitor. (Castiñeira Decl. ¶ 2.) OriGen simply accepted his resignation. Defendant cannot manufacture an equitable defense to his non-compete by issuing an extortionate ultimatum and calling his subsequent departure a "lay off." Furthermore, even if the non-competition covenant were unenforceable,

OriGen would still be entitled to the requested injunctive relief to prevent the misappropriation of its trade secrets under the DTSA.

### D. Granting the TRO is In the Public Interest.

Issuing a temporary restraining order will serve the public interest. The public has a compelling interest in "safeguarding fair commercial practices and in protecting employers from theft or piracy of trade secrets, confidential information, or, more generally, knowledge and technique in which the employer may be said to have a proprietary interest." *Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 894 (N.J. 1988). Furthermore, the public interest is advanced by holding sophisticated parties to their contractual agreements. Entering an injunction to prevent the brazen exploitation of stolen intellectual property by a direct competitor squarely aligns with these public policy objectives.

### E. The Requested TRO is Narrowly Tailored.

The requested Temporary Restraining Order is narrowly tailored to preserve the status quo. It merely seeks to (1) temporarily restrain Defendant from commencing employment with UniversalAGI in violation of his twelve-month non-compete; (2) prohibit the use, disclosure, or destruction of OriGen's trade secrets; and (3) freeze the devices and cloud accounts at issue so that they may be forensically preserved and analyzed by a neutral third party.

Under Federal Rule of Civil Procedure 65(c), the Court has wide discretion in setting the amount of a security bond. In Section 12(f) of the CIIAA, Defendant explicitly agreed that OriGen is entitled to injunctive relief "without the necessity of posting a bond or other security (or, where such a bond or security is required, that a $1,000 bond will be adequate)." (Torrado

Decl. Ex. A at Att. A, § 12(f).)  Based on this express contractual agreement, the Court should require a nominal bond of no more than $1,000.

## II.    THE COURT SHOULD PERMIT LIMITED EXPEDITED DISCOVERY.

OriGen also respectfully requests leave to conduct expedited, targeted forensic discovery. In the Third Circuit, courts apply a "good cause" standard to evaluate requests for expedited discovery prior to a Rule 26(f) conference.  *Strike 3 Holdings, LLC v. Doe*, 2020 U.S. Dist. LEXIS 114598, at *10 (D.N.J. June 30, 2020).  Good cause exists where "the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Id.* Both the urgency of the threat and the narrowly tailored nature of OriGen's request satisfy this standard.

### A.    Expedited Discovery Is Necessary to Prevent Further Irreparable Harm to OriGen.

To mitigate the ongoing threat to its intellectual property, OriGen must urgently ascertain the precise location of its exfiltrated data and determine whether any of it has been transmitted to third parties, including UniversalAGI. Because digital assets are easily transferrable and subject to immediate concealment, expedited forensic discovery is essential. *See, e.g., Mirashi*, 2025 U.S. Dist. LEXIS 54141, at 11 (granting expedited discovery and asset freezes where digital assets could be dissipated in minutes).  OriGen cannot rely on Defendant's unverified assurances that the data has not been shared, particularly given his admitted retention of the data and his refusal during weekend negotiations to permit OriGen to review his communications with UniversalAGI.  (Supp. Powell Decl. Ex. C).

### B.    Additional Factors Favor Expedited Discovery Here.

OriGen's request is minimally burdensome and narrowly tailored to the needs of the preliminary injunction hearing.  OriGen seeks only the prompt, neutral forensic imaging of the

specific devices implicated by the system logs and Defendant's own admissions: the unauthorized USB drive, his personal phone, and the personal OneDrive account linked to danielbadawi8@gmail.com, alongside targeted discovery regarding his communications with UniversalAGI.  Defendant's demonstrated willingness to misrepresent facts and alter documents necessitates this expedited timeline. He has repeatedly changed his story regarding the timing of his USB usage and the execution of his Termination Certification, and he deleted files from his work laptop and emptied the Recycle Bin before the machine could be secured.  (Pumar Decl. ¶ 6.)  Immediate forensic preservation and targeted discovery are therefore required to prevent the spoliation of evidence and to allow the Court to fashion appropriate preliminary relief.

## CONCLUSION

For the foregoing reasons, Plaintiff OriGen.AI, Inc. respectfully requests that the Court grant its motion and issue the Proposed Order to Show Cause with Temporary Restraints, setting a nominal bond of $1,000, on an urgent and expedited basis.

Respectfully submitted,

Dated: February 17, 2026

*/s/ John J. Powell*
John J. Powell (*pro hac vice* forthcoming)
Edward J. Heffernan (*pro hac vice* forthcoming)
Anna Volkov (Bar ID #547712025)
MONTGOMERY McCRACKEN
    WALKER & RHOADS LLP
1735 Market Street
Philadelphia, Pennsylvania 19103
(215) 772-7298
jpowell@mmwr.com
eheffernan@mmwr.com
avolkov@mmwr.com

*Counsel for Plaintiff OriGen.AI, Inc.*