**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

ORIGEN.AI, INC.,

Plaintiff,

v.

DANIEL BADAWI

Defendant.

Case No. _______________

**DECLARATION OF RUBEN RODRIGUEZ TORRADO**

I, Ruben Rodriguez Torrado, Ph.D. declare as follows:

1. I am the Founder and Chief Executive Officer of OriGen.AI, Inc. ("OriGen" or the "Company"). I submit this declaration in support of OriGen's emergency motion for a temporary restraining order and preliminary injunction. I have personal knowledge of the matters set forth in this declaration. If called as a witness, I could and would competently testify to the facts stated herein.

2. The relief OriGen requested is essential to preventing the imminent and irreversible disclosure of OriGen's core trade secrets—including our complete source code—by a former employee, Daniel Badawi, to a competitor, UniversalAGI.

3. Without Court intervention this disclosure will occur on February 16, 2026, when Badawi is scheduled to begin work at that company.

Background and Origen's Proprietary Technology

4. I am a computer scientist and petroleum reservoir engineer. My background includes graduate degrees in reservoir engineering and applied mathematics with a concentration in partial differential equations, as well as a Ph.D. in computer science from New York University. I founded OriGen in 2018.

5. OriGen is a pioneer in the use of artificial intelligence for the energy sector. We have spent years and millions of dollars developing Proteus, the leading AI-driven reservoir simulation platform. OriGen's software is used to simulate the flow of oil, gas, and other materials through underground and undersea reservoirs and optimize oil development operations. It does so thousands of times faster than other available methods of reservoir simulation.

6. Unlike traditional simulation methods, OriGen's software relies on painstakingly constructed Physics-Informed Neural Networks ("PINNs") and unique mathematical algorithms to simulate reservoir behavior in real-time. This technology constitutes the crown jewel of our company. The specific architecture of our neural networks, our training data models, and our source code are closely guarded trade secrets that give OriGen its competitive advantage.

Badawi's Employment and Access to Trade Secrets

7. On January 30, 2025, OriGen hired Daniel Badawi in the role of Physics Informed Neural Networks Engineer. In this role, Badawi was granted high-level access to OriGen's confidential information, including the source code for Proteus, our data models, and our proprietary algorithms.

8. As a condition of his employment, and to protect this sensitive information, Badawi executed a Confidential Information and Invention Assignment Agreement ("CIIAA") on January 30, 2025. A true and correct copy of the CIIAA is attached hereto as **Exhibit A**.

9. Pursuant to the CIIAA, Badawi agreed to hold OriGen's trade secrets in strictest confidence and promised not to use them for the benefit of any future employer. He further agreed to a non-competition covenant preventing him from working for a competing business for a period of one year following his separation.

10. OriGen goes to great lengths to protect the secrecy of its confidential information. All employee and customer agreements contain strict confidentiality provisions. Within the company, information is disclosed on a need-to-know basis. OriGen maintains SOC II Type 2 certification. OriGen has also adopted strict internal policies governing access to information. One example is OriGen's Security Access Control Policy, a copy of this policy is attached as **Exhibit B**. Badawi reaffirmed his understanding of and compliance with OriGen's Security Access Control Policy as recently as October 15, 2025.

Badawi's Resignation and Deceptive Conduct

11. On the evening of Friday, January 30, 2026, OriGen COO David Castineira informed me that Badawi received a competing job offer and would resign unless OriGen, on or before Sunday, February 1, provided him with a 50% salary increase and authorized his immediate relocation to Houston, Texas.

12. On Saturday, January 31, 2026, I received a redacted offer letter Badawi had provided to Dr. Castineira. Badawi redacted the offer letter to conceal the identity of his prospective employer.

13. On Sunday, February 1, 2026, at 9:30 p.m., I sent an email to Badawi formally invoking Section 7 of his CIIAA, which requires him to identify his new employer so that OriGen may assess potential conflicts of interest. A true and correct copy of this email is attached hereto as **Exhibit C**.

14. At 11:00 p.m. on February 1, Badawi replied to my email. He identified his new employer as "UniversalAGI." Crucially, he made specific representations to induce OriGen not to enforce the non-compete. He stated, in writing:

a. UniversalAGI is involved in "hydrodynamics and aerodynamics (CFD)."

b. “The company I am going to is in a different market.”

c. “I don’t think my move there would in any way violate my CIIAA agreement.”

A true and correct copy of Badawi’s February 1 email is attached hereto as **Exhibit D**.

15. Relying on Badawi’s representations, I immediately reviewed UniversalAGI’s website at approximately 11:30 p.m. on February 1. At that time, the website appeared to focus on general computational fluid dynamics and aerodynamics. I saw no references to the oil and gas sector or reservoir simulation. Based on Badawi’s assurances and this review, I initially believed his transition might not pose a competitive threat.

Badawi’s Departure and Refusal to Sign Certifications

16. On the morning of Monday, February 2, 2026, I revoked Badawi’s access to company systems and conducted an exit interview at 11:00 a.m.

17. During this interview, Badawi again confirmed to me that UniversalAGI was *not* working in oil and gas or related fields. Because I trusted his representations, I allowed him to remove what he claimed were “personal files” from his laptop under the supervision of his Team Lead, Alberto Pumar.

18. At 4:00 p.m. on February 2, Dr. Castineira sent Badawi a Termination Certification via DocuSign, as required by his CIIAA.

19. On February 3, 2026, Badawi sent an email to Dr. Castineira claiming, “I have signed the document.” This was a lie. Our DocuSign records indicate he viewed the document but never executed it. To date, he has refused to sign the certification confirming he has returned all OriGen property.

Discovery of Badawi's Misrepresentations and Data Theft

20. On Friday, February 6, 2026, the deception unraveled.

*LinkedIn Message Revealing UniversalAGI Recruiting Efforts*

21. As of February 6, 2026, OriGen was actively seeking to recruit an AI engineer to fill Badawi's now-vacant role and was considering several specific candidates for that position.

22. At 12:59 p.m. on February 6, I received a message on LinkedIn from one of the job candidates who we were planning to interview for Badawi's former role.

23. In a message about interview scheduling, the applicant mentioned that they were also interviewing with ***UniversalAGI*** for what they described as an "***almost identical role***." A copy of this message is attached as **Exhibit E**.

*Discovery of Change to UniversalAGI's Website*

24. I immediately returned to UniversalAGI's website.

25. As noted above, I had closely reviewed that website and other publicly available information about UniversalAGI immediately after Badawi disclosed the name of the company on February 1.

26. When I returned to that website on February 6, I was shocked to discover that UniversalAGI had posted a new job opening seeking to recruit a "Founding Reservoir Engineer / Reservoir Geologist (Modeling & Simulation)."

27. This posting, seeking "someone ready to push beyond the limits of traditional reservoir simulation," then proceeds to describe in explicit details UniversalAGI's intent to build the exact platform OriGen has already created using physics informed neural networks.

28. A copy of this job posting is attached as **Exhibit F**.

29.    UniversalAGI's Founding Reservoir Engineer job posting makes clear that the company is not in "a different market," as Badawi repeatedly insisted to OriGen on January 30, February 1, and February 2.  In fact, it is actively seeking to develop and commercialize a PINN-based AI-driven reservoir simulation platform, making it OriGen's direct competitor.

*Discovery of Synced One Drive Folder*

30.    Realizing that Badawi had lied about the nature of his new employment, I immediately ordered a preliminary internal investigation and forensic review of Badawi's work laptop, which had been returned to the company on February 2.

31.    At or around 4:00 p.m. on February 6, Alberto Pumar and I reviewed the laptop.

32.    We discovered that Badawi had set up a Microsoft OneDrive folder titled "Daniel – Personal" that was synced to the local drive of his OriGen laptop.

33.    Inside this synced folder was a complete copy of OriGen's source code repositories, along with hundreds of other proprietary files, data models, and trade secrets.

34.    Screenshots of this folder structure are attached to the accompanying declaration of Alberto Pumar ("Pumar Declaration").  *See* Pumar Decl. at Ex. A.

*Discovery of Unauthorized USB Connection on January 30, 2026*

35.    Further forensic analysis performed that evening revealed that on January 30, 2026—between 8:53 p.m. and 8:56 p.m.—Badawi connected unauthorized USB storage devices to his laptop multiple times.  *See also* Pumar Decl.

36.    The timing of this theft is significant.  Badawi exfiltrated our source code to USB drives just two hours after issuing his resignation ultimatum to Dr. Castineira on January 30, and shortly before sending Dr. Castineira an email attaching a redacted version of his offer letter from UniversalAGI concealing the company's name.

37. OriGen immediately engaged counsel to seek to resolve this matter with Badawi and UniversalAGI as described in the accompanying declaration of John Powell.

38. On Saturday, February 7, OriGen received an additional LinkedIn message confirming that UniversalAGI had actively reached out to the candidate OriGen was interviewing to fill Badawi's vacant position. A copy of that LinkedIn message is attached as **Exhibit G**.

39. On Sunday, February 8, 2026, OriGen's counsel sent a cease and desist letter to Badawi, with a copy to the CEO of UniversalAGI.

40. As of Monday, February 9, 2026, UniversalAGI removed all job postings from the "join us" page on website. A copy of that website page as it appeared on February 9 and continues to appear today is attached as **Exhibit H**.

Irreparable Harm

41. UniversalAGI is not a "different market" company as Badawi claimed; they are standing up a direct competitor to our flagship product.

42. Badawi is now in possession of the blueprint for our entire business. If he is permitted to begin employment at UniversalAGI while in possession of our source code, UniversalAGI will be able to bypass years of research and development, effectively cloning our proprietary technology overnight.

43. The harm to OriGen from such disclosure would be incalculable, immediate, and irreversible. It would destroy the competitive advantage that is the basis of our company's value.

I declare under penalty of perjury under the laws of the United States and the State of New Jersey that the foregoing is true and correct.

Executed on February 13, 2026

Ruben Rodriguez Torrado

**LIST OF EXHIBITS**

| | |
|---|---|
| Exhibit A | Confidential Information and Invention Assignment Agreement (CIIAA) executed by Daniel Badawi on January 30, 2025. |
| Exhibit B | Example of OriGen internal data policies (System Access Control Policy) and Badawi’s acknowledgment thereof |
| Exhibit C | Email from Ruben Rodriguez Torrado to Daniel Badawi, dated February 1, 2026 (9:30 p.m.), invoking Section 7 of the CIIAA. |
| Exhibit D | Email response from Daniel Badawi to Ruben Rodriguez Torrado, dated February 1, 2026 (11:00 p.m.), identifying UniversalAGI and claiming it was "in a different market." |
| Exhibit E | LinkedIn message from job candidate to Torrado, February 6, 2026 at 12:59 p.m. |
| Exhibit F | Job posting from UniversalAGI for a "Founding Reservoir Engineer / Reservoir Geologist (Modeling & Simulation)." |
| Exhibit G | LinkedIn message from job candidate to Torrado, February 7, 2026 at 7:14 a.m. |
| Exhibit H | Printout of the “Join Us” page of the UniversalAGI website as it appeared on February 9, 2026 and still appears as of this declaration |

**ORIGEN.AI, INC.**

January 29th, 2025

Daniel Badawi

Address: 950 Colgate Drive, Apt 1310
College Station, Texas, 77840

Dear Dr. Badawi,

Origen.AI, Inc., a Delaware corporation (the "Company"), is pleased to offer you employment with the Company on the terms described below.

1. **Position.** You will start in a full-time position as Physics Informed Neural Networks Engineer, and you will initially report to Alberto Pumar or his successor. Your primary duties will be to research and develop techniques such as, but not limited to, mathematical algorithms, products, data models, artificial intelligence solutions, etc. to be used in a wide range of activities including industrial and non-industrial activities. By signing this letter, you confirm with the Company that you are under no contractual or other legal obligations that would prohibit you from performing your duties with the Company.

2. **Compensation and Employee Benefits.**

(a) You will be paid a starting salary of $110,000 USD per year, payable on the Company's regular payroll dates. Upon completing the first six months of employment, your salary will be subject to review.

(b) You will have a discretionary bonus of up to $3,500 USD per year, based on your performance and the financial situation of the company. It will be conditional to your continued status as an employee in good standing, as of December 31st to consolidate the bonus. This bonus will be based on the natural year (from January 1st to December 31st). Any employee who starts after January 1st will have their bonus prorated to the number of months worked in the company

(c) You may participate in the health insurance of the company, if available in your state, after the waiting period, as outlined in 2(d). The company additionally provides dental and vision insurance coverage.

(d) The waiting period of 30 days for health insurance and 90 days for 401K participation commences from the first working day of the Employee.

(e) Health insurance premium is fully covered by the company to the employee if he chooses to participate. This full coverage refers solely to the employee and no other member of the employee's family nucleus. Should you choose to enroll beneficiaries, the fees for them will be payable by yourself.

(f) After the waiting period as outlined in 2(d), you may participate in the 401 K of the company with a 4% matching as outlined in the 401K materials that will be provided.

(g) Your schedule will be with respect to the Eastern Time (ET) time zone, following the company Core Hours policy.

(h) It is mandatory that the Employee, work in the Company office, located in the New Jersey area, three days per week, on an average basis, with the understanding that on occasion, the company may require your attendance at the office for a longer period.

(i) The offer extended to you is contingent upon the successful acquisition of your Employment Authorization Document (EAD) card.

3. **Confidential Information and Invention Assignment Agreement.** Like all Company employees, you will be required, as a condition of your employment with the Company, to sign the Company's enclosed standard Confidential Information and Invention Assignment Agreement.

4. **Employment Relationship.** Employment with the Company is for no specific period of time. Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause. Any contrary representations which may have been made to you are superseded by this offer. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and the Company's Chief Executive Officer.

5. **Performance Reviews and Evaluations.** As part of our commitment to ensuring mutual success, we may conduct regular performance reviews and evaluations. These reviews are designed to assess your progress in meeting the company's expectations and objectives. The outcomes of these evaluations may influence decisions related to your role, responsibilities, future opportunities within the company, or continued employment. Your employment with the

6. Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause.

7. **Outside Activities.** While you render services to the Company, you agree that you will not engage in any other employment, consulting, or other business activity without the written consent of the Company.

8. **Care and Use of Company Assets:** Employees are expected to responsibly care for, use, and maintain all Company assets, including but not limited to office equipment, electronic devices, and workspaces. Each employee is responsible for ensuring that any assets entrusted to them are well-maintained and used solely for business purposes. Personal use of Company devices or equipment, including but not limited to browsing, downloading non-work-

related content, or installing unauthorized software, is strictly prohibited unless explicitly authorized by the Company. Misuse or neglect of Company assets may result in termination.

9. Return of Assets. Upon termination or transfer, employees are required to return all Company assets in their possession in good working condition, accounting for normal wear and tear. All assets must be returned within 24 hours of separation from employment or within 24 hours of notification of transfer. Failure to return Company assets in a timely manner may result in disciplinary action, including withholding of final pay or other measures as deemed appropriate by the Company.

10. Post-Termination Access and Property Return Agreement. I acknowledge and agree that upon the termination of my relationship with the Company, I am prohibited from using any Company access credentials, logins, or other means to access Origen.AI's systems, platforms, or any Company property, including confidential data and client information. I further agree to immediately return all Company property, data, and information in my possession or control.

11. **Taxes, Withholding and Required Deductions.** All forms of compensation referred to in this letter are subject to all applicable taxes, withholding and any other deductions required by applicable law.

12. **Miscellaneous.**

(a) **Governing Law.** The validity, interpretation, construction and performance of this letter, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of New York, without giving effect to principles of conflicts of law.

(b) **Entire Agreement.** This letter sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c) **Counterparts.** This letter may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of a facsimile copy will have the same force and effect as execution of an original, and a facsimile signature will be deemed an original and valid signature.

(d) **Electronic Delivery.** The Company may, in its sole discretion, decide to deliver any documents or notices related to this Agreement, securities of the Company or any of its affiliates or any other matter, including documents and/or notices required to be delivered to you by applicable securities law or any other law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means. You hereby consent to (i) conduct business electronically, (ii) receive such documents and notices by such electronic delivery and (iii) sign documents electronically and agree to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

(e) **Inmigration Status.** The employee's immigration status and any legal requirements associated with it are entirely the responsibility of the employee. Our organization is committed to compliance with all applicable laws and does not make any decisions or judgments related to immigration matters. It is the employee's responsibility to maintain valid work authorization and immigration-related documentation. The company will not be held liable for any issues related to the employee's immigration status.

*[Signature Page Follows]*

If you wish to accept this offer, please sign and date both the enclosed duplicate original of this letter and the enclosed Confidential Information and Invention Assignment Agreement and return them to me. As required, by law, your employment with the Company is also contingent upon your providing legal proof of your identity and authorization to work in the United States, as well as successfully passing the Company mandated background check. This offer, if not accepted, will expire at 11:59 pm EST on **January 30th, 2024.**

We look forward to having you join us no later than **February 10th, 2025, ,**

Very truly yours,

ORIGEN.AI, INC.

By:______________________
(Signature)

Rubén Rodríguez Torrado
(Name)

CEO
(Title)

ACCEPTED AND AGREED:

DANIEL BADAWI

Daniel Badawi
(Signature)

01 / 30 / 2025
Date

Anticipated Start Date: February 10th, 2025

Attachment A: Confidential Information and Invention Assignment Agreement

Doc ID: 397e183f2146fbde2f651124e21b874196df175e

**ATTACHMENT A**

**CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT**

*(See Attached)*

Doc ID: 397e183f2146fbde2f651124e21b874196df175e

**ORIGEN.AI, INC.**

**CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT**

*Employee Name:* Daniel Badawi

*Effective Date:* January 29th, 2025

As a condition of my becoming employed (or my employment being continued) by Origen.AI, Inc., a Delaware corporation, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, the receipt of Confidential Information (as defined below) while associated with the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, I hereby agree to the following:

1. **Relationship.** This Confidential Information and Invention Assignment Agreement (this "Agreement") will apply to my employment relationship with the Company. If that relationship ends and the Company, within one (1) year thereafter, either reemploys me or engages me as a consultant, I agree that this Agreement will also apply to such later employment or consulting relationship unless the Company and I otherwise agree in writing. Any employment or consulting relationship between the parties hereto, whether commenced prior to, upon, or after the date of this Agreement, is referred to herein as the "Relationship."

2. **Applicability to Past Activities.** The Company and I acknowledge that I may have performed work, activities, services, or made efforts on behalf of or for the benefit of the Company, or related to the current or prospective business of the Company in anticipation of my involvement with the Company, that would have been within the scope of my duties under this agreement if performed during the term of this Agreement, for a period of time prior to the Effective Date of this Agreement (the "Prior Period"). Accordingly, if and to the extent that, during the Prior Period: (i) I received access to any information from or on behalf of the Company that would have been Confidential Information (as defined below) if I received access to such information during the term of this Agreement; or (ii) I (a) conceived, created, authored, invented, developed or reduced to practice any item (including any intellectual property rights with respect thereto) on behalf of or for the benefit of the Company, or related to the current or prospective business of the Company in anticipation of my involvement with the Company, that would have been an Invention (as defined below) if conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement; or (b) incorporated into any such item any pre-existing invention, improvement, development, concept, discovery or other proprietary information that would have been a Prior Invention (as defined below) if incorporated into such item during the term of this Agreement; then any such information shall be deemed "Confidential Information" hereunder and any such item shall be deemed an "Invention" or "Prior Invention" hereunder, and this Agreement shall apply to such activities, information or item as if disclosed, conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement.

Doc ID: 397e183f2146fbde2f651124e21b874196df175e

3.    **Confidential Information.**

(a)    **Protection of Information.**  I understand that during the Relationship, the Company intends to provide me with certain information, including Confidential Information (as defined below), without which I would not be able to perform my duties to the Company.  At all times during the term of the Relationship and thereafter, I shall hold in strictest confidence, and not use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.  I shall not make copies of such Confidential Information except as authorized by the Company or in the ordinary course of my obligations to the Company under the Relationship.

(b)    **Confidential Information.**  I understand that "Confidential Information" means any and all information and physical manifestations thereof not generally known or available outside the Company and information and physical manifestations thereof entrusted to the Company in confidence by third parties, whether or not such information is patentable, copyrightable or otherwise legally protectable.  Confidential Information includes, without limitation:  (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

(c)    **Third Party Information.**  My agreements in this Section 3 are intended to be for the benefit of the Company and any third party that has entrusted information or physical material to the Company in confidence.  During the term of the Relationship and thereafter, I will not improperly use or disclose to the Company any confidential, proprietary or secret information of my former employer(s) or any other person, and I will not bring any such information onto the Company's property or place of business.

(d)    **Other Rights.**  This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

Doc ID: 397e183f2146fbde2f651124e21b874196df175e

(e) **U.S. Defend Trade Secrets Act.** Notwithstanding the foregoing, the U.S. Defend Trade Secrets Act of 2016 ("DTSA") provides that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (iii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In addition, DTSA provides that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

4. **Ownership of Inventions.**

(a) **Inventions Retained and Licensed.** I have attached hereto, as Exhibit A, a complete list describing with particularity all Inventions (as defined below) that, as of the Effective Date: (i) have been created by or on behalf of me, and/or (ii) are owned exclusively by me or jointly by me with others or in which I have an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder (collectively "Prior Inventions"); or, if no such list is attached, I represent and warrant that there are no such Inventions at the time of signing this Agreement, and to the extent such Inventions do exist and are not listed on Exhibit A, I hereby irrevocably and forever waive any and all rights or claims of ownership to such Inventions. I understand that my listing of any Inventions on Exhibit A does not constitute an acknowledgement by the Company of the existence or extent of such Inventions, nor of my ownership of such Inventions. I further understand that I must receive the formal approval of the Company before commencing my Relationship with the Company.

(b) **Use or Incorporation of Inventions.** If in the course of the Relationship, I use or incorporate into any of the Company's products, services, processes or machines any Invention not assigned to the Company pursuant to Section 4(d) of this Agreement in which I have an interest, I will promptly so inform the Company in writing. Whether or not I give such notice, I hereby irrevocably grant to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute such Invention under all applicable intellectual property laws without restriction of any kind.

(c) **Inventions.** I understand that "Inventions" means discoveries, developments, concepts, designs, ideas, know how, modifications, improvements, derivative works, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable. I understand this includes, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon. I understand that "Company Inventions" means any and all Inventions that I may solely or jointly

author, discover, develop, conceive, or reduce to practice during the period of the Relationship or otherwise in connection with the Relationship, except as otherwise provided in Section 4(g) below.

(d) **Assignment of Company Inventions.** I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all of my right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights and other proprietary rights therein. I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, that I now have or may hereafter have for infringement of any and all Company Inventions. I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary. Any assignment of Company Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law. If I have any rights to the Company Inventions, other than Moral Rights, that cannot be assigned to the Company, I hereby unconditionally and irrevocably grant to the Company during the term of such rights, an exclusive, irrevocable, perpetual, worldwide, fully paid and royalty-free license, with rights to sublicense through multiple levels of sublicensees, to reproduce, distribute, display, perform, prepare derivative works of and otherwise modify, make, have made, sell, offer to sell, import, practice methods, processes and procedures and otherwise use and exploit, such Company Inventions.

(e) **Maintenance of Records.** I shall keep and maintain adequate and current written records of all Company Inventions made or conceived by me (solely or jointly with others) during the term of the Relationship. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format. The records will be available to and remain the sole property of the Company at all times. I shall not remove such records from the Company's place of business or systems except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business. I shall deliver all such records (including any copies thereof) to the Company at the time of termination of the Relationship as provided for in Section 5 and Section 6.

(f) **Intellectual Property Rights.** I shall assist the Company, or its designee, at its expense, in every proper way in securing the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, Moral Rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive and shall never assert such

rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. My obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue during and at all times after the end of the Relationship and until the expiration of the last such intellectual property right to expire in any country of the world. I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead to execute and file any such instruments and papers and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright, mask work and other registrations related to such Company Inventions. This power of attorney is coupled with an interest and shall not be affected by my subsequent incapacity.

(g) **Exception to Assignments.** Subject to the requirements of applicable state law, if any, I understand that the Company Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention which qualifies fully for exclusion under the provisions of applicable state law, if any. In order to assist in the determination of which inventions qualify for such exclusion, I will advise the Company promptly in writing, during and for a period of twelve (12) months immediately following the termination of the Relationship, of all Inventions solely or jointly conceived or developed or reduced to practice by me during the period of the Relationship.

5. **Company Property; Returning Company Documents.** I acknowledge that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, files, e-mail messages, and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored or reviewed at any time without notice. I further acknowledge that any property situated on the Company's premises or systems and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. At the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

6. **Termination Certification.** In the event of the termination of the Relationship, I shall sign and deliver the "Termination Certification" attached hereto as Exhibit B; however, my failure to sign and deliver the Termination Certification shall in no way diminish my continuing obligations under this Agreement.

7. **Notice to Third Parties.** During the periods of time during which I am restricted in taking certain actions by the terms of Section 8 of this Agreement (the "Restriction Period"), I shall inform any entity or person with whom I may seek to enter into a business relationship (whether as an owner, employee, independent contractor or otherwise) of my contractual obligations under this Agreement. I acknowledge that the Company may, with or without prior

notice to me and whether during or after the term of the Relationship, notify third parties of my agreements and obligations under this Agreement. Upon written request by the Company, I will respond to the Company in writing regarding the status of my employment or proposed employment with any party during the Restriction Period.

8. **Solicitation of Employees, Consultants and Other Parties; Non-Compete.** As described above, I acknowledge that the Company's Confidential Information includes information relating to the Company's employees, consultants, customers and others, and I will not use or disclose such Confidential Information except as authorized by the Company in advance in writing. I further agree as follows:

(a) **Employees, Consultants.** During the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I shall not, directly or indirectly, solicit any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit employees or consultants of the Company, either for myself or for any other person or entity.

(b) **Other Parties.** During the term of the Relationship, I will not influence any of the Company's clients, licensors, licensees or customers from purchasing Company products or services or solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

(c) **Non-Compete.** During the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the relationship for any reason, whether with or without cause, I shall not directly or indirectly, whether as owner, sole proprietor, partner, shareholder, director, member, consultant, agent, founder, co-venture partner or otherwise engage, invest or participate in any business that is similar to those which the Company has created, has under development or are the subject of active planning from time to time during my employment with the Company, provided, however, that I may own, as a passive investor, publicly-traded securities of any corporation that competes with the business of the Company so long as such securities do not, in the aggregate, constitute more than three percent (3%) of any class of outstanding securities of such corporations.

9. **At-Will Relationship.** I understand and acknowledge that, except as may be otherwise explicitly provided in a separate written agreement between the Company and me, my Relationship with the Company is and shall continue to be at-will, as defined under applicable law, meaning that either I or the Company may terminate the Relationship at any time for any reason or no reason, without further obligation or liability, other than those provisions of this Agreement that explicitly continue in effect after the termination of the Relationship.

10. **Representations and Covenants.**

(a) **Facilitation of Agreement.** I shall execute promptly, both during and after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of this Agreement, upon the Company's written request to do so.

(b) **No Conflicts.** I represent and warrant that my performance of all the terms of this Agreement does not and will not breach any agreement I have entered into or will enter into, with any third party, including without limitation any agreement to keep in confidence proprietary information or materials acquired by me in confidence or in trust prior to or during the Relationship. I will not disclose to the Company or use any inventions, confidential or non-public proprietary information, or material belonging to any previous client, employer, or any other party. I will not induce the Company to use any inventions, confidential or non-public proprietary information, or material belonging to any previous client, employer, or any other party. I represent and warrant that I have listed on Exhibit A all agreements (*e.g.,* non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.), if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company. I shall not enter into any written or oral agreement that conflicts with the provisions of this Agreement.

(c) **Voluntary Execution.** I certify and acknowledge that I have carefully read all of the provisions of this Agreement, that I understand and have voluntarily accepted such provisions, and that I will fully and faithfully comply with such provisions.

11. **Electronic Delivery.** Nothing herein is intended to imply a right to participate in any of the Company's equity incentive plans, however, if I do participate in such plan(s), the Company may, in its sole discretion, decide to deliver any documents related to my participation in the Company's equity incentive plan(s) by electronic means or to request my consent to participate in such plan(s) by electronic means. I hereby consent to receive such documents by electronic delivery and agree, if applicable, to participate in such plan(s) through an online or electronic system established and maintained by the Company or a third party designated by the Company.

12. **Miscellaneous.**

(a) **Governing Law.** The validity, interpretation, construction, and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed, and interpreted in accordance with the laws of the state of New York, without giving effect to principles of conflicts of law.

(b) **Entire Agreement.** This Agreement sets forth the entire agreement and understanding between the Company and me relating to its subject matter and merges all prior discussions between us. No amendment to this Agreement will be effective unless in writing signed by both parties to this Agreement. The Company shall not be deemed hereby to have

Doc ID: 397e183f2146fbde2f651124e21b874196df175e

waived any rights or remedies it may have in law or equity, nor to have given any authorizations or waived any of its rights under this Agreement, unless, and only to the extent, it does so by a specific writing signed by a duly authorized officer of the Company, it being understood that, even if I am an officer of the Company, I will not have authority to give any such authorizations or waivers for the Company under this Agreement without specific approval by the Board of Directors.  Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.

(c)     **Successors and Assigns.**  This Agreement will be binding upon my heirs, executors, administrators, and other legal representatives, and my successors and assigns, and will be for the benefit of the Company, its successors, and its assigns.

(d)     **Notices.**  Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(e)     **Severability.**  If one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected.  The Company and I have attempted to limit my right to use, maintain and disclose the Company's Confidential Information, and to limit my right to solicit employees and customers only to the extent necessary to protect the Company from unfair competition.  Should a court of competent jurisdiction determine that the scope of the covenants contained in Section 8 exceeds the maximum restrictiveness such court deems reasonable and enforceable, the parties intend that the court should reform, modify and enforce the provision to such narrower scope as it determines to be reasonable and enforceable under the circumstances existing at that time.

(f)     **Remedies.**  I acknowledge that violation of this Agreement by me may cause the Company irreparable harm, and therefore I agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

(g)     **Advice of Counsel.**  I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT.  THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

Doc ID: 397e183f2146fbde2f651124e21b874196df175e

      (h) **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

*[Signature Page Follows]*

Doc ID: 397e183f2146fbde2f651124e21b874196df175e

The parties have executed this Confidential Information and Invention Assignment Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

**THE COMPANY:**

ORIGEN.AI, INC.

By: ______________________
(Signature)

Name: Rubén Rodríguez Torrado

Title: CEO

Address: 370 Jay Street 7th Floor
Brooklyn NY, 11201
United States

Date: 01 / 30 / 2025

**EMPLOYEE:**

Daniel Badawi
(PRINT NAME)

(Signature)

Address:
950 Colgate Dr
College Station, TX 77840
Email: daniel.db1988@gmail.com

Date: 01 / 30 / 2025

CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT OF ORIGEN.AI, INC.

## EXHIBIT A

## LIST OF PRIOR INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP EXCLUDED UNDER SECTION 4(a) AND CONFLICTING AGREEMENTS DISCLOSED UNDER SECTION 10(b)

The following is a list of (i) all Inventions that, as of the Effective Date: (A) have been created by me or on my behalf, and/or (B) are owned exclusively by me or jointly by me with others or in which I have an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder and (ii) all agreements, if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company:

| Title | Date | Identifying Number or Brief Description |
| --- | --- | --- |
| None | | |

Except as indicated above on this Exhibit, I have no inventions, improvements or original works to disclose pursuant to Section 4(a) of this Agreement and no agreements to disclose pursuant to Section 10(b) of this Agreement.

_0_ Additional sheets attached

Signature of Employee: Daniel Badawi

Print Name of Employee: Daniel Badawi

Date: 01 / 30 / 2025

# System Access Control Policy

**OriGen.AI**

---

## Background

Access to Origen.AI systems and applications is limited for all users, including but not limited to workforce members, volunteers, business associates, contracted providers, and consultants. Access by any other entity is allowable only on a minimum necessary basis. All users are responsible for reporting an incident of unauthorized use or access of the organization's information systems.

## Purpose

The purpose of this procedure is to provide a policy and guideline for creating, modifying, or removing access to the company's network and data by creating, changing or deleting the network account configuration for a User.

## Scope

This policy and defined process is used to allow access to the company's data and systems to individuals who meet the requirements defined in this policy. This policy governs individuals who are granted access that is necessary to support the business. This policy relates to all data used, processed, stored, maintained, or transmitted in and through the company's systems.

## Policy

### Access Establishment and Modification - Role-Based

Requests for access to Origen.AI Platform systems and applications are made formally using the following process:

- An Origen.AI workforce member initiates the access request by creating an Issue in the Origen.AI ticketing system.
    - User identities must be verified prior to granting access to new accounts.
    - Identity verification must be done in person where possible; for remote employees, identities must be verified over the phone.
    - For new accounts, the method used to verify the user's identity must be recorded on the Issue.

- The Security Lead will grant or reject access to systems as dictated by the employee's role and job title.
    - If additional access is required outside of the minimum necessary to perform job functions, the requester must include a description of why the additional access is required as part of the access request.
    - If the request is rejected, it goes back for further review and documentation.
    - If the review is approved, the request is marked as "Done", and any pertinent notes are added.

### Access Reviews

All access to Origen.AI systems and services is reviewed and updated on an annual basis to ensure proper authorizations are in place commensurate with job functions. The process for conducting reviews is outlined below:

1. The Security Lead initiates the review of user access by creating an Issue in the Origen.AI Ticketing System

2. The Security Lead is assigned to review levels of access for each Origen.AI workforce member.
3. If user access is found during review that is not in line with the least privilege principle, the Security Lead may modify user access and notify the user of access changes.
4. Once the review is complete, the Security Lead then marks the ticket as "Done", adding any pertinent notes required.

## Workforce Clearance

- The level of security assigned to a user to the organization's information systems is based on the minimum necessary amount of data access required to carry out legitimate job responsibilities assigned to a user's job classification.
- All access is regulated by the role-based access control (RBAC) method, based on the *Principle of Least Privilege*.
- Origen.AI maintains a least privileged approach for access to customer data.

## Role Definitions and Access Permissions

To ensure efficient and secure access to Origen.AI systems, the following roles have been established, each with specific responsibilities and access permissions:

- Owner: Has full access to all resources within the Azure subscription, capable of managing resources, role assignments, and policies. This role is typically reserved for high-level management with strategic oversight.
- Contributor: Can create and manage Azure resources but cannot manage role assignments. Suitable for developers, system engineers, and operational staff involved in the day-to-day management of Azure resources.
- Reader: Possesses read-only access to view all resources without the ability to make changes. Ideal for roles requiring oversight without operational control, such as auditors or compliance officers.
- User Access Administrator: Manages user access and role assignments within Azure, ensuring that users have appropriate access based on their job functions.
- DevOps Engineer: A custom role that blends the permissions of Contributor and User Access Administrator to fit the unique needs of DevOps practices within Origen.AI.
- Security Manager: Focuses on the configuration and management of security policies, network security groups, and other security-related Azure resources.
- Network Engineer: Responsible for managing and configuring Azure's virtual network settings, including gateways, subnets, and security rules.
- Data Scientist/Data Engineer(Research): Handles data-related services such as Azure SQL Database, Azure Data Lake, and Azure Synapse Analytics, with access tailored to the management of these resources.

These roles are designed to align with the Principle of Least Privilege, ensuring that individuals have only the access necessary to perform their job functions. Roles and permissions are subject to periodic review and adjustment to adapt to changing needs and to ensure continued alignment with Origen.AI's security policies and business objectives.

## Unique User Identification

- Access to the Origen.AI Platform systems and applications is controlled by requiring unique User Login IDs and passwords for each individual user and developer.
- Passwords requirements mandate strong password controls.
- Passwords are not displayed at any time and are not transmitted or stored in plain text.
- Default accounts on all production systems, including root, are disabled.
- Shared accounts are not allowed within Origen.AI Production systems or networks.
- Automated log-on configurations other than the company's approved Password Management provider that store user passwords or bypass password entry are not permitted for use with Origen.AI workstations or production systems.

## Automatic Logoff

Users are required to make information systems inaccessible by any other individual when unattended by the users (ex. by using a password protected screen saver or logging off the system).

## Employee Workstation Use

All workstations at Origen.AI are company owned, and all are laptop products running Windows, Mac OSX or Linux.

- Workstations may not be used to engage in any activity that is illegal or is in violation of company policies.
- Access may not be used for transmitting, retrieving, or storage of any communications of a discriminatory or harassing nature or materials that are obscene or "X-rated". Harassment of any kind is prohibited. No messages with derogatory or inflammatory remarks about an individual's race, age, disability, religion, national origin, physical attributes, sexual preference, or health condition shall be transmitted or maintained. No abusive, hostile, profane, or offensive language is to be transmitted through the organization's system.
- Information systems/applications also may not be used for any other purpose that is illegal, unethical, or against company policies or contrary to the company's best interests. Messages containing information related to a lawsuit or investigation may not be sent without prior approval.
- Solicitation of non-company business, or any use of the company's information systems/applications for personal gain is prohibited.
- Users may not misrepresent, obscure, suppress, or replace another user's identity in transmitted or stored messages.
- Workstation hard drives must be encrypted
- All workstations have firewalls enabled to prevent unauthorized access unless explicitly granted.

## Employee Termination/Offboarding Procedures

- The Human Resources Department (or other designated department), users, and their supervisors are required to notify the Security Lead upon completion and/or termination of access needs and facilitate completion of the "Offboarding Checklist".
- The Human Resources Department, users, and supervisors are required to notify the Security Lead to terminate a user's access rights if there is evidence or reason to believe the following (these incidents are also reported on an incident report and is filed with the Privacy Lead):
  - The user has been using their access rights inappropriately;
  - A user's password has been compromised (a new password may be provided to the user if the user is not identified as the individual compromising the original password);

- It is expected that the Security Lead terminate users' access rights within **1 business day** of termination/separation, and will coordinate with the appropriate Origen.AI employees to terminate access to any non-production systems managed by those employees.
- The Security Lead audits and may terminate access of users that have not logged into the organization's information systems/applications for an extended period of time.

## Revision History

| Version | Date | Editor | Approver | Description of Changes | Format |
|---|---|---|---|---|---|
| | | | | | |

Personnel
Personnel
Exclusions
Personnel Details
Daniel Badawi
Former employee
Personnel Policy Status
Acceptable Use Policy
Backup Policy
Code of Conduct
Data Classification Policy
Data Protection Policy
Data Retention Policy
Disaster Recovery Plan
Encryption Policy
Incident Response Plan
Information Security Policy
Logging and Monitoring Policy
Password Policy
Physical Security Policy
Risk Assessment Policy
System Access Control Policy
Vulnerability Management Policy
Close
MFA) on IdP
rt Completion Date
eb 3, 2025
Offboarding Evidence
DM
David Maczka
david.maczka@ori...

**Personnel Details**

DB

**Daniel Badawi**

daniel@origen.ai

Former employee

**Hire Date – Separation Date**

Feb 6, 2025 – Feb 3, 2026

**Acknowledged Policies**

Last checked 5 months ago

**Primary Identity Provider**

Not Connected

**Primary HRIS Provider**

Not Connected

**Multi-Factor Authentication (MFA) on IdP**

Last checked 7 hours ago

**Last Background Check Report Completion Date**

Last checked 9 months ago

**Manual report** | Completed on Feb 3, 2025

**Last Security Training Completion Date**

**Torrado Decl. Ex. C**

**Powell, John**

---

| | |
|---|---|
| **From:** | Ruben Rodriguez Torrado <rubentorrado@origen.ai> |
| **Sent:** | Sunday, February 1, 2026 9:30 PM |
| **To:** | Daniel Badawi |
| **Cc:** | Powell, John; danielbadawi8@gmail.com |
| **Subject:** | Request Pursuant to Section 7 of CIAA |

****CAUTION** External Email**

Hello Daniel,

I write pursuant to Section 7 of your Confidential Information and Invention Assignment Agreement ("CIAA") with Origen.AI, Inc. ("Company") executed January 30, 2025, to request that you respond in writing regarding the status of your proposed employment by a third party during the Restriction Period. Please note that it is Company protocol, in situations such as this, to activate and enforce the procedures set forth in Section 7 of the CIAA.

On or before February 2nd at 9:00 a.m., please comply with your obligations under the CIAA by providing a response to this request in writing (email is fine):

(1) identifying the third party with whom you propose to be employed during the Restriction Period, and

(2) confirming that you have informed the proposed employer of all of your obligations under the CIAA.

The Company has no interest in interfering with your prospective employment, but requires this response to protect and facilitate the enforcement of its rights under the CIAA and to determine next steps.

Thank you,

**Ruben Rodriguez Torrado, PhD**
Founder and CEO
**OriGen.AI**
"Real Time Simulation and Optimization"

(917) 679-4703
rubentorrado@origen.ai
https://www.origen.ai/

**Torrado Decl. Ex. D**

**Powell, John**

**From:** Daniel Badawi <danielbadawi8@gmail.com>
**Sent:** Sunday, February 1, 2026 10:58 PM
**To:** Ruben Rodriguez Torrado
**Cc:** Daniel Badawi; Powell, John
**Subject:** Re: Request Pursuant to Section 7 of CIAA

**CAUTION** External Email

Hello Ruben,

Thank you for your explanatory email.

I understand my obligations toward OriGenAI which I greatly love and forever appreciate.

1. I am moving to a company called UniversalAGI located in Silicon Valley in California. This is their website: www.universalagi.com. The company is involved in hydrodynamics and aerodynamics (CFD).

2. The company is aware of the CIAA that I have with OriGenAI.

To sum up, the company I am going to is in a different market, and therefore I don't think my move there would in any way violate my CIAA agreement with OriGen.

Ruben, as I said many times, not now not in anytime in the future I will do anything to hurt OriGen. OriGen for me will always be a home, and I will always cheer for OriGen, and wish it all the best.

Please let me know the next steps.

All the best,

Daniel

On Sun, Feb 1, 2026 at 21:30 Ruben Rodriguez Torrado <rubentorrado@origen.ai> wrote:

> Hello Daniel,
>
> I write pursuant to Section 7 of your Confidential Information and Invention Assignment Agreement ("CIAA") with Origen.AI, Inc. ("Company") executed January 30, 2025, to request that you respond in writing regarding the status of your proposed employment by a third party during the Restriction Period.

Please note that it is Company protocol, in situations such as this, to activate and enforce the procedures set forth in Section 7 of the CIAA.

On or before February 2nd at 9:00 a.m., please comply with your obligations under the CIAA by providing a response to this request in writing (email is fine):

(1) identifying the third party with whom you propose to be employed during the Restriction Period, and

(2) confirming that you have informed the proposed employer of all of your obligations under the CIAA.

The Company has no interest in interfering with your prospective employment, but requires this response to protect and facilitate the enforcement of its rights under the CIAA and to determine next steps.

Thank you,



**Ruben Rodriguez Torrado, PhD**
Founder and CEO
**OriGen.AI**
"Real Time Simulation and Optimization"

(917) 679-4703
rubentorrado@origen.ai
https://www.origen.ai/

**Torrado Decl. Ex. E**

**MESSAGE**

Mobile • 25m ago

(He/Him) • 12:59 PM

Hi Ruben,

I hope you're doing well.
I wanted to follow up regarding the meeting we had tentatively planned for this week with you and David. My advisor, [redacted], and my former manager, [redacted], both mentioned they know him and asked me to pass along their regards.

I'm very happy to meet next week as well and can send a calendar invite once I know what your availability looks like. Please feel free to share a few time slots that work best for you.

I'm also currently in early-stage conversations and interviews for a similar role , almost identical role, at universalAGI, so I wanted to stay proactive on scheduling while timelines are still flexible.
Looking forward to speaking with you.

availability looks like. Please feel free to share a few time slots that work best for you.

I'm also currently in early-stage conversations and interviews for a similar role , almost identical role, at universalAGI, so I wanted to stay proactive on scheduling while timelines are still flexible.
Looking forward to speaking with you.

Best regards,
[redacted]

# Founding Reservoir Engineer / Reservoir Geologist (Modeling & Simulation)

Location

San Francisco

Employment Type

Full time

Location Type

On-site

Department

Technical Staff ›

CFD & Physical Systems Engineering

Overview Application

📍 San Francisco | Work Directly with CEO & founding team | Report to CEO | OpenAI for Physics | 🏢 5 Days Onsite

Founding Reservoir Engineer / Reservoir Geologist (Modeling & Simulation)

Location: Onsite in San Francisco

Compensation: Competitive Salary + Equity

## Who We Are

UniversalAGI is building OpenAI for Physics. AI startup based in San Francisco and backed by Elad Gil (#1 Solo VC), Eric Schmidt (former Google CEO), Prith Banerjee (ANSYS CTO), Ion Stoica (Databricks Founder), Jared Kushner (former Senior Advisor to the President), David Patterson (Turing Award Winner), and Luis Videgaray (former Foreign and Finance Minister of Mexico). We're building foundation AI models for

physics that enable end-to-end industrial automation from initial design through optimization, validation, and production.

We're building a high-velocity team of relentless researchers and engineers that will define the next generation of AI for industrial engineering. If you're passionate about AI, physics, or the future of industrial innovation, we want to hear from you.

### About the Role

As a founding Reservoir Engineer / Geologist, you'll be in the arena from day one, building the future of AI for physics simulation with your own hands. This is your chance to take everything you've learned in reservoir geology and use it to build foundation AI models that will transform how the entire industry works.

You'll work directly with the CEO and founding team to shape our product around the real pain points you've faced in your career: the tedious data preparation, the manual grid and upscaling loops, and endless history-matching.

### What You'll Do

- Design, preprocess, grid, simulate, and post-process reservoir models (geological and flow) at unprecedented scale and speed, using industry-standard simulators and real subsurface data.
- Develop systematic workflows to generate hundreds or thousands of reservoir scenarios, including geological realizations, well configurations, and operating conditions—building the data pipelines that will train our foundation models.
- Guide the development of our product and our AI models for physical systems by working directly on research problems with our AI team, bridging the gap between traditional reservoir simulation and modern machine learning.
- Work directly with clients to define benchmark datasets, validation criteria, and end-to-end workflows that demonstrate our models can match or exceed conventional reservoir simulation accuracy and decision value.
- Generate high-quality simulation data at scale, every simulation you run directly improves our foundation models.
- Advise the AI research team on the nuances that matter in subsurface modeling: model fidelity, black-oil vs compositional vs thermal models, gridding and upscaling tradeoffs, relative permeability, well controls, and numerical stability.

- Lead technical conversations with customers and internal teams, translating between the language of reservoir engineering / geology and the world of AI and foundation models.
- This role is for someone ready to push beyond the limits of traditional reservoir simulation, tackle deep uncertainty and scale challenges, and help define the next generation of subsurface engineering and decision-making.

### Qualifications

- M.S. or Ph.D. in Reservoir Engineering, Petroleum Engineering, Geology/Geoscience, or closely related field (required).
- 3+ years of hands-on industry experience doing reservoir modeling and reservoir simulation end-to-end, ideally in an operator, service company, or subsurface consultancy setting.
- Expert in reservoir simulator frameworks (e.g., SLB ECLIPSE / INTERSECT, CMG (IMEX/GEM/STARS), tNavigator, Nexus, or similar) and comfortable working directly with simulation decks / control files.
- Deep understanding of subsurface flow and numerical simulation: multiphase Darcy flow, PVT, relative permeability & capillary pressure, well modeling/controls, initialization, boundary conditions, convergence/stability, and common failure modes.
- Experience with model building and conditioning: gridding, upscaling, faults/barriers, contacts, rock/fluid property population, and rigorous QC to ensure simulation-ready inputs.
  Ability to design and execute systematic scenario studies (sensitivities, uncertainty ensembles, development plan variants) and produce clean, explainable outputs that can serve as ground truth for ML.
- Ability to design and execute systematic scenario studies (sensitivities,

← <O> UniversalAGI

data-quality mindset.

- Exceptional creativity, problem-solving ability, ambition, and attention to detail.
- Comfortable working in high-intensity, fast-paced startup environments with evolving priorities and tight deadlines.

### Bonus Qualifications

- Prior experience integrating AI/ML (or proxy/surrogate models) into subsurface workflows, or partnering with ML teams to define training targets and validation.
- Experience at high-growth AI / deep-tech startups (Seed to Series C) or in a forward-deployed / client-facing technical role.

### Cultural Fit

- Technical Respect: Ability to earn respect through hands-on technical contribution
- Intensity: Thrives in our unusually intense culture - willing to grind when needed
- Customer Obsession: Passionate about solving real customer problems, not just cool tech
- Deep Work: Values long, uninterrupted periods of focused work over meetings
- High Availability: Ready to be deeply involved whenever critical issues arise
- Communication: Can translate complex technical concepts to customers and team
- Growth Mindset: Embraces the compounding returns of intelligence and continuous learning
- Startup Mindset: Comfortable with ambiguity, rapid change, and wearing multiple hats
- Work Ethic: Willing to put in the extra hours when needed to hit critical milestones
- Team Player: Collaborative approach with low ego and high accountability

### What We Offer

- Opportunity to shape the technical foundation of a rapidly growing foundational AI company.
- Work on cutting-edge industrial AI problems with immediate real-world impact.
- Direct collaboration with the founder & CEO and ability to influence company strategy
- Competitive compensation with significant equity upside.
- In-person first culture - 5 days a week in office with a team that values face-to-face collaboration.

- Access to world-class investors and advisors in the AI space.

**Benefits**

We provide great benefits, including:

- Competitive compensation and equity.
- Competitive health, dental, vision benefits paid by the company.
- 401(k) plan offering.
- Flexible vacation.
- Team Building & Fun Activities.
- Great scope, ownership and impact.
- AI tools stipend.
- Monthly commute stipend.
- Monthly wellness / fitness stipend.
- Daily office lunch & dinner covered by the company.
- Immigration support.

**How We're Different**

"The credit belongs to the man who is actually in the arena, whose face is marred by dust and sweat and blood; who strives valiantly; who errs, who comes short again and again... who at the best knows in the end the triumph of high achievement, and who at the worst, if he fails, at least fails while daring greatly." - Teddy Roosevelt

At our core, we believe in being "in the arena." We are builders, problem solvers, and risk-takers who show up every day ready to put in the work: to sweat, to struggle, and to push past our limits. We know that real progress comes with missteps, iteration, and resilience. We embrace that journey fully knowing that daring greatly is the only way to create something truly meaningful.

**If you're ready to join the future of physics simulation, push creative boundaries, and deliver impact, UniversalAGI is the place for you.**

Case 2:26-cv-01558 Document 6-3 Filed 02/17/26 Page 42 of 44 PageID: 108

Apply for this Job

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Powered by Ashby

Privacy Policy Security Vulnerability Disclosure



**Ruben Rodriguez Torrado** · 7:13 AM

Sent! Just curious—did you apply to UniversalAGI, or did they reach out to you?

(He/Him) · 7:14 AM

They reached out

They have recruiters actively reac[...] candidates.

Thanks for your invite Ruben.
Looking forward to speak to you.




<O> UniversalAGI

## Open Positions (0)

Filter Open Positions...

Powered by Ashby

Privacy Policy Security Vulnerability Disclosure